HOIN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| AFFORDABLE HOME HEALTH CARE, | : | Case No.  1:24-cv-21 |
| LLC DBA SUMMIT ORTHOPEDIC HOME | : | |
| CARE | : | Judge |
| 2760 Airport Drive | : | |
| Building C, Suite 160 | : | |
| Columbus, Ohio 43219 | : | |
| | : | |
| And | : | |
| | : | |
| SUMMIT HOME HEALTHCARE, LLC | : | **COMPLAINT FOR INJUNCTIVE** |
| 2760 Airport Drive | : | **RELIEF AND DAMAGES** |
| Building C, Suite 160 | : | |
| Columbus, Ohio 43219 | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| EVOLUTION HOME HEALTH, LLC | : | |
| 700 Taylor Road, Suite 100 | : | |
| Gahanna, Ohio 43230, | : | |
| | : | |
| JACK BECKER | : | |
| 45 South Ridge Drive | : | |
| Martins Ferry, Ohio 43935, | : | |
| | : | |
| JAMIE SANDERS | : | |
| 2143 Lamont Avenue | : | |
| Columbus, Ohio, 43224, | : | |
| | : | |
| FAIRFIELD HOME CARE, LLC | : | |
| 8208 Reynoldswood Drive | : | |
| Reynoldsburg, Ohio 43068, | : | |
| | : | |
| NINAS' HEALTH CARE FAIRFIELD | : | |
| INCORPORATED | : | |
| 8208 Reynoldswood Drive | : | |
| Reynoldsburg, Ohio 43008, | : | |
| | : | |
| JOSEPH KESSINGER | : | |
| | : | |

1

130656997v1

507 Burns Drive                                       :
Westerville, Ohio 43082,                    :
 :

REBECCA ADAMS                      :
1307 Autumnview Drive                :
Batavia, Ohio 45103,                     :
 :

CYNTHIA STRATTON                   :
175 Indian Run Drive                   :
Dublin, OH 43017,                     :
 :

SCOTT DEAN                             :
1511 Woodline Court                   :
Marysville, Ohio 43040,               :
 :

JENNA WELL                            :
12687 Harmon Road                   :
Pickerington, Ohio 43147,            :
 :

DENNIS SWEARINGEN                :
5644 Jennybrook Lane                 :
Hilliard, Ohio 43147,                  :
 :

ROBERT G. BECKER                    :
582 Courtright Drive E                :
Pickerington, Ohio 43147,            :
 :

KEVIN FINNEY                         :
6200 Breeze Hill Road                :
Crestwood, Kentucky 40014,       :
 :

EMILY WELCH                        :
9250 One Deerfield Place              :
Mason, Ohio 45040                     :
 :

AMANDA STEELE                     :
12148 Herons Landing Drive        :
Pickerington, Ohio 43147             :
 :

CANDICE SMITH                     :
10197 Coronado Court                 :
Plain City, Ohio 43064               :
 :

CHERYL BECKER                    :
6696 Bluebird Lane                   :
Canal Winchester, Ohio 43110      :

2

```
And,                                    :
                                        :
John Does 1-10                          :
                                        :
            Defendants.                 :
```

Plaintiffs Affordable Home Health Care, LLC d/b/a Summit Orthopedic Home Care and Summit Home Healthcare, LLC (collectively, "Summit"), for their Complaint against Defendants Evolution Home Health, LLC ("Evolution"), Jack Becker ("J. Becker"), Jamie Sanders ("Sanders"), Fairfield Home Care, LLC ("Fairfield Home Care"), Ninas' Health Care Fairfield Incorporated ("Ninas' Health Care"), Joseph Kessinger ("Kessinger"), Rebecca Adams ("Adams"), Cynthia Stratton ("Stratton"), Scott Dean ("Dean"), Jenna Well ("Well"), Dennis Swearingen ("Swearingen"), Robert G. Becker ("R. Becker"), Kevin Finney ("Finney"), Emily Welch ("Welch"), Amanda Steele ("Steele"), Candice Smith ("Smith"), Cheryl Becker ("C. Becker"), and John Does 1 through 10 (Evolution, J. Becker, Sanders, Fairfield Home Care, Ninas' Health Care, Kessinger, Adams, Dean, Well, Stratton, Swearingen, R. Becker, Finney, Welch, Steele, Smith, C. Becker, and John Does 1 through 10 are, collectively, "Defendants") allege as follows:

## **NATURE OF THE ACTION**

1.      Summit brings this suit for injunctive relief and damages to redress Defendants' systematic and flagrant violations of legal obligations owing to Summit.

2.      Summit is engaged in the business of providing specialty health care services such as home health, orthopedics, neurology, infusion care, and hospice care for patients in local Ohio and Indiana communities.

3.      Evolution is also a business engaged in providing specialty health care services, such as home health care services.

130656997v1

4.      Summit and Evolution are competitors in the specialty health care services industry.

5.      Critical to this industry are relationships developed with senior living communities and the staff at those communities.  Companies like Summit and Evolution endeavor to become preferred service providers to the communities and the residents who live there.

6.      Evolution is a company created in October 2023, and on information and belief, its owners, management, and staff are almost exclusively former Summit employees, including its President, Defendant J. Becker.

7.      On information and belief, Evolution is also being operated by, and was at least in part created and funded by or through J. Becker's brother, Defendant R. Becker, who is the former Chief Executive Officer ("CEO") of Summit (Summit terminated R. Becker's employment in March 2023).

8.      During his tenure as CEO of Summit, R. Becker stocked the organization with his family members and cronies.  As CEO, R. Becker hired family members and friends who were loyal to him, maintained improper relationships with subordinate staff, terminated staff who dared to question his authority or decision-making, and rewarded his favored employees with excessive pay packages.

9.      As CEO, R. Becker attempted to maintain control over Summit through various tactics that included intimidation, verbal abuse, and outright threats.  He threatened Summit staff that he believed were not fully aligned with his view that he alone was in charge of Summit. At one point, he demanded loyalty oaths from them.  In at least one meeting with a Summit board member, R. Becker threatened the board member with physical harm.

10.     Throughout R. Becker's tenure as CEO of Summit, he frequently made comments and took actions suggesting that he alone was the cause of Summit's success and that Summit staff should only take orders from him.  He made threats to Summit's owners and board members that he would metaphorically "burn Summit to the ground" if ownership questioned his decision-making or failed to acquiesce to his every whim.

11.     R. Becker also stymied efforts by Summit's owners to exercise oversight of Summit's operations, largely by controlling the operational and financial information that was delivered to Summit's owners.  R. Becker's control of Summit's operational and financial information harmed Summit during the attempted sale of Summit by its owners to a third party.  During the negotiations, R. Becker undermined the sale process, leading the potential acquirer to abandon the purchase, all because R. Becker did not believe the sale would appropriately reward him.

12.     Following the sabotaged sale process, R. Becker helped orchestrate a sale on terms that ensured Becker's continuing role at Summit.

13.     By March 2023, as Summit's owners learned additional details of R. Becker's inappropriate behavior, mismanagement, misconduct, and insubordination, the owners were left with no option but to terminate his employment for cause and to subsequently terminate employment of several senior staff who were closely connected and loyal to him, including Defendants J. Becker, Sanders, and Swearingen.

14.     After his termination, R. Becker set out on a plan to enlist the other Defendants and "burn Summit to the ground" by creating Evolution and targeting Summit clients, customers, referral sources, and staff.

5

15.     J. Becker, R. Becker, Sanders, Kessinger, Adams, Dean, Well, Stratton, Swearingen, Welch, Steele, Smith, C. Becker and John Does 1 through 10 (collectively, the "Individual Defendants") were all formerly employed by Summit.  Each executed employment agreements with Summit as a condition of their employment.[1]

16.     The Individual Defendants' agreements contain confidentiality provisions and restrictive covenants, including covenants not to solicit Summit's customers, referral sources, business relationships, and employees, or encourage any employee of Summit to terminate their employment with Summit.  They agreed forever to comply with the confidentiality protections in the agreements.  The Individual Defendants agreed to be bound by the restrictive covenants for one year after their separation from Summit.

17.     Defendant R. Becker executed an employment agreement as a condition of his employment with Summit.  R. Becker's employment agreement includes confidentiality provisions and restrictive covenants.  R. Becker agreed forever to comply with the confidentiality protections in the agreement.  R. Becker's employment also agreement includes restrictive covenants that prohibit R. Becker from (i) soliciting Summit's customers, referral sources, business relationships, and employees, or encouraging any employee of Summit to terminate their employment with Summit, and (ii) engaging or participating in, or providing

---

[1] R. Becker's Employment Agreement (Exhibit A) is different from the other Individual Defendants' Employment Agreements in several respects.  However, like the other Individual Defendants' Agreements with Summit which are referenced in this Complaint and attached as Exhibits, R. Becker's Employment Agreement contains restrictive covenants, including covenants not to compete, not to solicit, and not to misuse or disclose confidential information. Where appropriate, this Complaint distinguishes R. Becker and his Agreement with Summit from the Individual Defendants' and their Agreements with Summit.  References to the Individual Defendants' obligations under the Agreements, particularly the restrictive covenants contained within the Agreements, generally apply to each of the Individual Defendants, including R. Becker.

6

advice or services to, any business or line of business that provides home health services in Ohio or any state contiguous to Ohio. Defendant R. Becker agreed to be bound by these restrictive covenants for one year after his separation from Summit.

18.     R. Becker agreed the restrictive covenants within his employment agreement do not prevent him from earning a livelihood, that the covenants are reasonably necessary to protect Summit's legitimate business interests, and that the covenants are not overbroad or unreasonable.

19.     Each of the Individual Defendants and, on information and belief, Defendant R. Becker, now works directly with, for, and/or for the benefit of Evolution, a direct competitor of Summit. Each of the Individual Defendants associated with Evolution and/or assisted in the creation of Evolution almost immediately after their separation of employment with Summit, and some, on information and belief, even before they left Summit.

20.     Defendant Sanders, a former Summit employee, formed Evolution on October 9, 2023 by filing formation documents with the Delaware Secretary of State.

21.     On information and belief, former Summit CEO, Defendant R. Becker, worked with Defendant Sanders to form Evolution. And after its formation, R. Becker negotiated agreements with vendors and third parties on behalf of Evolution to initiate Evolution's operations, and also negotiated Evolution's acquisition of Defendant Fairfield Home Care in or around November 2023 to further facilitate Evolution's scheme to compete directly with Summit.

22.     Evolution's current president is Defendant J. Becker, a former Summit employee. At R. Becker's behest, J. Becker participated in the solicitation of many of the other Individual Defendants. He even solicited Summit employees while employed by Summit to work for a new home health company that his brother – terminated CEO R. Becker – vowed to create. J. Becker

7

was terminated by Summit in June 2023 when Summit discovered that he was actively soliciting and encouraging Summit employees to leave and work for the home health company his brother R. Becker planned to form.

23. Evolution's current Chief Human Resources Officer is Defendant Swearingen, a former Summit employee. He is familiar with the Individual Defendants and the restrictive covenants in their agreements with Summit.

24. Evolution hired the Individual Defendants with full knowledge of their employment and agreements with Summit.

25. Evolution hired the Individual Defendants to work in the same or substantially similar capacity as they did for Summit so that Evolution could unfairly compete with Summit.

26. Evolution hired the Individual Defendants to work in the same markets and same facilities as Summit so that Evolution could unfairly compete with Summit.

27. Among other things, the Individual Defendants and Evolution used Summit's confidential information and trade secrets to identify, contact, and solicit Summit's patients, customers, clients, and referral sources, and employees, and interfere with Summit's business relationships with those parties.

28. Over many years, Summit developed preferred provider relationships with various senior living communities through its compilation of confidential information related to, among other things, a combination of service, care, and competitive intelligence on the needs of specific senior living communities and their residents. Summit utilizes a unique, multi-faceted approach to engage with the senior living communities it serves, all with the purpose of tailoring its approach to serving the community's residents. This type of relationship building through which Summit learns of specific needs of a particular facility is a key component of its business

8

development efforts, as Summit's services and personnel are individually tailored to each facility, as the needs of staff and residents vary location to location.

29.     By developing and nurturing relationships with senior living communities and their staff, Summit receives patient referrals from facility health and wellness directors, activities directors, floor nurses, and physicians (in house and external).

30.     Through these relationships, Summit is notified by senior living community staff of health care needs of a particular resident, and Summit engages with the referred patient (or the patient's family member or caregiver) and then connects the referred patient with its clinical employees who provide the requested health care services.  The relationship is between Summit and the patient, not the employee and the patient.  Further, charges for the services rendered by Summit staff are billed by Summit, and not by the individual employee.

31.     This relationship development with senior living communities is precisely what Defendants J. Becker, R. Becker, Kessinger, C. Becker and Adams, and other Individual Defendants, performed in their roles with Summit, armed with the competitive intelligence developed over many years by Summit to do it.

32.     By leveraging Summit's lengthy and successful relationships with various senior living communities, Evolution sought to "jump start" its operations to compete with Summit, despite various contractual restrictions.  Evolution did not have the capability to develop its own competitive intelligence or rely on a track record, so it stole Summit's competitively sensitive information, referral and patient relationships, and goodwill to market itself as an industry equivalent of Summit to try to displace Summit and its clinicians from various senior living communities.

33.     Senior living communities prefer that home health agencies demonstrate reliable outcomes data for patients and possess acceptable Medicare Star Ratings (signifying the delivery of high quality patient care) to ensure that the home health agency will deliver high quality care to residents.  Upon its formation, Evolution had no such measurable historical outcome data, no quality data, and in fact, no clinical staff to perform services.  Evolution management knew that it could not compete with Summit without unfairly leveraging Summit's existing network, business relationships and clinical personnel to try to enter specific communities.

34.     Evolution and the Individual Defendants have used and continue to use Summit's confidential business intelligence to target the exact senior living communities and other locations where they know Summit is a preferred provider (or has developed long standing relationships) in and near Franklin County and Hamilton County, Ohio.

35.     Evolution has intentionally and erroneously advised Summit employees, including the Individual Defendants it hired away from Summit, that they will no longer be able to serve patients where Summit is the preferred provider because Evolution alleges it is supplanting or has supplanted Summit as that preferred provider.

36.     Using non-public patient census, referral  data, as well as non-public information about facility staff, Individual Defendants have appeared in person at several senior living communities in and near Franklin County and Hamilton County, Ohio where Summit is a preferred home health provider to speak with Summit's patients, as well as facility staff such as executive directors, health and wellness directors, activities directors, floor nurses, and physicians (in house and external).  During these visits, Evolution staff have displayed Evolution business cards and discarded Summit marketing materials at those facilities.

10

37. Individual Defendants misled Summit's patients by claiming Summit is no longer able to serve them.

38. Individual Defendants misled staff at multiple senior living communities by claiming that Summit has exited or will exit from certain locations, that it is going bankrupt, and that Evolution is taking away all Summit staff, thereby sowing doubt about whether Summit staff are or will be available to render services to patients.

39. On information and belief, Individual Defendants misled patients and staff at senior living communities about Evolution's ability to bill for services rendered to patients despite not having the required Medicare, Medicaid and/or other third-party payer agreements in place to submit claims for reimbursement for such services.

40. On information and belief, Individual Defendants have rendered and continue to render services to patients despite Evolution itself not having applicable agreements in place to submit claims for reimbursement.  On information and belief, Evolution does not currently have Medicare, Medicaid, and/or other third-party payer agreements in place as is required to submit claims for reimbursement for services performed by Evolution staff.

41. On information and belief, R. Becker and Individual Defendants enticed two other home health care entities—Defendants Fairfield Home Care and Ninas' Health Care—to join Evolution's scheme to intentionally harm Summit by interfering with Summit's business relationships.

42. On information and belief, Evolution and Defendant Fairfield Home Care entered an agreement in or around November 2023 pursuant to which Evolution purchased Defendant Fairfield Home Care.  On information and belief, this transaction was directed, negotiated, and

11

finalized on Evolution's behalf by Defendants R. Becker and Sanders, and the initial purchase price for the transaction was paid by Defendant Finney.

43. On information and belief, Defendant Finney is aware of Defendant R. Becker's restrictive covenants with Summit and similar covenants that other Individual Defendants have with Summit.

44. On information and belief, Defendant R. Becker directed the consummation of the acquisition of Fairfield Home Care so that patient care services performed by Evolution staff could be billed for reimbursement through Medicare, Medicaid, and/or other third-party payer agreements held by Fairfield Home Care.

45. On information and belief, Evolution also entered into an arrangement with Defendant Ninas' Health Care whereby Ninas' Health Care submits claims to Medicare, Medicaid, and/or other third-party payer contracts for services performed by Evolution staff.

46. Staff performing services for which claims for reimbursement are submitted are generally employed by the party who submits the claims, unless the treating providers have entered into a third-party billing agreement under which the services are billed appropriately.

47. On information and belief, Fairfield Home Care and Ninas' Health Care have submitted claims for payment and continue to submit claims for services performed by Evolution staff at senior living communities where the Individual Defendants are prohibited from servicing patients under their respective agreements with Summit.

48. On information and belief, Fairfield Home Care and Ninas' Health Care are billing for services performed by Evolution staff and funneling all or a portion of the reimbursements they receive under this arrangement to Evolution, even though Evolution is not authorized to receive such reimbursements.

49.     On information and belief, Fairfield Home Care has been complicit in the wrongful conduct of Evolution and the Individual Defendants.

50.     On information and belief, Ninas' Health Care has been complicit in the wrongful conduct of Evolution and the Individual Defendants.

51.     Defendants' wrongful acts have caused and continue to cause Summit irreparable harm.

## PARTIES, VENUE, AND JURISDICTION

52.     Summit is headquartered at 2760 Airport Drive, Building C, Suite 160, Columbus, Ohio 43219.

53.     Evolution is a Delaware limited liability company.  Upon information and belief, it is not registered to do business in Ohio.

54.     J. Becker is an Ohio resident and the current President of Evolution.  He has a home address of 45 Southridge Drive, Martins Ferry, Ohio 43935.

55.     Sanders is an Ohio resident and the current Chief Financial Officer of Evolution. She has a home address of 2143 Lamont Avenue, Columbus, Ohio 43224.

56.     Fairfield Home Care is an Ohio limited liability company with a principal office located in Reynoldsburg, Ohio. It may be served through its statutory agent at 8208 Reynoldswood Drive, Reynoldsburg, Ohio 43068.

57.     Ninas' Health Care is an Ohio corporation with a principal office located in Reynoldsburg, Ohio. It may be served through its statutory agent at 8208 Reynoldswood Drive, Reynoldsburg, Ohio 43068.

58.     Kessinger is an Ohio resident with a home address of 507 Burns Drive Westerville, Ohio 43082.

130656997v1

59.     Adams is an Ohio resident with a home address of 1307 Autumnview Drive, Batavia, Ohio 45103.

60.     Stratton is an Ohio resident with a home address of 175 Indian Run Drive, Ohio 43017.

61.     Dean is an Ohio resident with a home address of 1511 Woodline Court, Marysville, Ohio 43040.

62.     Well is an Ohio resident with a home address of 12687 Harmon Road, Pickerington, Ohio 43147.

63.     Swearingen is an Ohio resident with a home address of 5644 Jennybrook Lane, Hilliard, Ohio 43026.

64.     R. Becker is an Ohio resident with a home address of 582 Courtright Drive E, Pickerington, Ohio 43147.

65.     Finney is a Kentucky resident with a home address of 6200 Breeze Hill Road, Crestwood, Kentucky 40014.

66.     Welch is an Ohio resident with a home address of 9250 One Deerfield Place, Mason, Ohio 45040.

67.     Steele is an Ohio resident with a home address of 12148 Herons Landing Drive, Pickerington, Ohio 43147.

68.     Smith is an Ohio resident with a home address of 10197 Coronado Court, Plain City, Ohio 43064.

69.     C. Becker is an Ohio resident with a home address of 6696 Bluebird Lane, Canal Winchester, Ohio 43110.

70.     John Does 1 through 10 are former Summit employees, current Evolution

Employees, and/or individuals who have breached agreements with Summit and/or induced

others to unfairly compete with Summit and improperly use Summit's confidential information.

71.     Summit brings claims against Defendants under the Federal Trade Secrets Act, 18

U.S.C. § 186.36, *et seq.*, which specifically provides that "[t]he district courts of the United

States shall have jurisdiction of civil actions brought" thereunder.  18 U.S.C. § 1836(c).  The

Court thus has federal question jurisdiction over the subject matter of this lawsuit under 28

U.S.C. § 1331.

72.     The Court has supplemental jurisdiction over Summit's remaining claims under

28 U.S.C. § 1367(a) because Summit's remaining claims "are so related to" Summit's claims

within the Court's original jurisdiction "that they form part of the case or controversy."

73.     Under 28 U.S.C. § 1391(b)(2), venue is proper in this judicial district because a

substantial part of the events or omissions giving rise to Summit's claims occurred in this

judicial district.  Defendant R. Becker's Employment Agreement (Exhibit A) also provides, "[i]n

addition, any legal suit, action or proceeding arising out of or relating to this Agreement shall be

instituted exclusively in the federal or state courts in Hamilton County, Ohio…."

## BACKGROUND FACTS

### Summit's Business

74.     Summit, through its nurses and therapists, provides specialty health care services

for patients in local communities served by Summit, including residents in senior living

communities throughout Ohio and parts of Indiana. These services include home health,

orthopedics, neurology, infusion care, and hospice care services.

75.     As part of the development of its business, Summit has expended substantial time,

labor, and money in developing strong relationships with customers, clients, and referral sources,

as a trusted provider of high quality home health services and other specialized health care services.

76.     To develop its business, Summit has invested significant time, resources and money to hire and train qualified clinical staff, as well as to research and develop proprietary business methods, strategies, technologies, processes, intellectual property, marketing plans and procedures, and other proprietary information on patient needs, its patient census, client preferences, referral sources, development of employees and customers, and other confidential and proprietary information.

77.     Summit's business model is unique among home health care providers.  Summit and its clinicians serve patients that are generally home bound, and who reside in senior living communities that include assisted living communities and other independent living communities. In the context of its work with senior living communities, Summit assigns certain clinical staff to specific senior living communities to perform services for patients in those facilities.  Through this approach, Summit staff become engrained in the senior living community's operations relating to the use of home health services, as well as the senior living community staff who direct referrals for such services.  These relationships have significant value to Summit and take years to develop.

78.     Summit has taken reasonable measures to protect and maintain the secrecy of its confidential business information and trade secrets, including, but not limited to, by restricting access to such, use of password protections, as well as maintaining policies, agreements and an employee handbook which emphasize the confidential nature of Summit's proprietary trade secret information and prohibit unauthorized use or disclosure of such information by Summit employees.

79. Summit's confidential business information and trade secrets have independent economic value from not being generally known to or readily ascertainable through proper means by the general public, including Summit's competitors, who could obtain economic value from the disclosure or use of such information.

**Individual Defendants' Employment with Summit**

*J. Becker's Employment with Summit*

80. J. Becker joined Summit as a Sales Liaison on July 25, 2022.

81. On July 12, 2022, as a condition of his continued employment with Summit, J. Becker executed the Agreement attached as Exhibit B.

82. J. Becker later became a Regional Director of Business Development and Director of Business Development for Summit.

83. J. Becker served as Director of Business Development until his termination from Summit on June 12, 2023.

84. As part of his job responsibilities with Summit, J. Becker had access to and knowledge of Summit's confidential information and trade secrets.

85. During his employment with Summit, J. Becker received substantial compensation from it.

86. On information and belief, J. Becker associated with Evolution on or before his termination in June 2023 and is currently Evolution's president.

*Sanders' Employment with Summit*

87. Sanders joined Summit as Controller on October 18, 2021.

88. On October 5, 2021, as a condition of her continued employment with Summit, Sanders executed the Agreement attached as Exhibit C.

17

89.     Sanders served as Summit's Controller until her resignation from Summit on July 15, 2023.

90.     As part of her job responsibilities with Summit, Sanders had access to and knowledge of Summit's confidential information and trade secrets.

91.     During her employment with Summit, Sanders received substantial compensation from it.

92.     Sanders formed Evolution on October 9, 2023.

### *Kessinger's Employment with Summit*

93.     Kessinger joined Summit as a PRN Physical Therapist on July 12, 2017.

94.     On September 22, 2017, as a condition of his continued employment with Summit, Kessinger executed the Agreement attached as Exhibit D.

95.     Kessinger later became a Clinical Liaison for Summit.

96.     Kessinger served as Clinical Liaison until his termination from Summit on November 29, 2023 for violating company policy.

97.     For Summit, Kessinger performed services for Summit patients residing in various senior living communities, including the following: StoryPoint (senior living communities throughout Ohio, including central Ohio) and Danbury Traditions (senior living communities in and around Columbus and Cincinnati).

98.     Summit is a preferred provider at StoryPoint and Danbury Traditions, and Kessinger's relationships with those facilities and their staff were developed solely through Summit.

99.     As part of his job responsibilities with Summit, Kessinger had access to and knowledge of Summit's confidential information and trade secrets.

18

130656997v1

100.     Kessinger used Summit's goodwill to gain entry to the facilities he worked in while with Summit after his separation from Summit.

101.     During his employment with Summit, Kessinger received substantial compensation from it.

102.     On information and belief, Kessinger associated with Evolution on or around November 29, 2023.

### *Adams' Employment with Summit*

103.     Adams joined Summit as a sales liaison on September 18, 2019.

104.     On September 14, 2019, as a condition of her continued employment with Summit, Adams executed the Agreement attached as Exhibit E.

105.     Adams later became a Regional Director of Business Development for Summit.

106.     Adams served as Regional Director of Business Development until her termination from Summit on July 17, 2023 as a result of the elimination of the Regional Director of Business Development position.

107.     Summit had reorganized its business development roles, creating a new role of Director of Business Development.

108.     Summit posted the newly created Director of Business Development position internally and externally, and requested that Adams apply for it.

109.     Adams refused to apply for the Director of Business Development position, telling at least one coworker that she intended to leave her employment with Summit.

110.     Summit has long-term business relationships and substantial goodwill in the home health care industry.

111.     For Summit, Adams was the point of contact for specific preferred provider locations in greater Cincinnati.  She worked directly with senior living communities to introduce

Summit so that Summit could provide specialty healthcare services. One such community is The Kenwood, an assisted living and independent senior living community in Cincinnati, Ohio.

112. Adams served as Summit's point of contact with The Kenwood and many other facilities.

113. As part of her job responsibilities with Summit, Adams had access to and knowledge of Summit's confidential information and trade secrets.

114. Adams had access to and has used Summit's goodwill to gain entry to the referral sources she worked with while with Summit after her separation from Summit.

115. During her employment with Summit, Adams received substantial compensation from it.

116. On information and belief, Adams associated with Evolution at or near the time of her separation from Summit.

### *Stratton's Employment with Summit*

117. Stratton joined Summit as a PRN Physical Therapist on November 7, 2018.

118. On October 21, 2018, as a condition of her continued employment with Summit, Stratton executed the Agreement attached as Exhibit F.

119. Stratton served as a PRN Physical Therapist until her resignation from Summit on December 5, 2023.

120. For Summit, Stratton performed services for Summit patients residing in various senior living communities, including StoryPoint (senior living communities throughout Ohio, including central Ohio).

121. Summit is a preferred provider at StoryPoint, and Stratton's relationships with StoryPoint facilities and staff were developed solely through Summit.

20

122.    As part of her responsibilities with Summit, Stratton had access to and knowledge of Summit's confidential information and trade secrets.

123.    During her employment with Summit, Stratton received substantial compensation from it.

124.    On information and belief, Stratton associated with Evolution at or near the time of her separation from Summit.

### *Dean's Employment with Summit*

125.    Dean joined Summit as a physical therapist on June 26, 2019.

126.    On May 19, 2019, as a condition of his continued employment with Summit, Dean executed the Agreement attached as Exhibit G.

127.    Dean served as a physical therapist until his resignation from Summit on November 27, 2023, and his last day at Summit was December 15, 2023.

128.    For Summit, Dean performed services for Summit patients residing in various assisted living and senior living communities, including, but not limited to, StoryPoint Grove City, Springleaf, and Walnut Crossing.

129.    Summit is a preferred provider at StoryPoint Grove City, Springleaf, and Walnut Crossing, and Dean's relationships there were developed solely through Summit.

130.    As part of his responsibilities with Summit, Dean had access to and knowledge of Summit's confidential information and trade secrets.

131.    During his employment with Summit, Dean received substantial compensation from it.

132.    On information and belief, Dean associated with Evolution at or near the time of his separation from Summit.

130656997v1

### *Well's Employment with Summit*

133.    Well joined Summit as a part-time RN on March 30, 2021.

134.    On March 6, 2021, as a condition of her continued employment with Summit, Well executed the Agreement attached as Exhibit H.

135.    Well later became an Oasis registered nurse (RN) for Summit.

136.    Well served as an RN for Summit until her resignation from Summit on October 27, 2023, and her last day at Summit was November 9, 2023.

137.    For Summit, Well performed services for Summit patients residing in various assisted living and senior living communities, including, but not limited to, StoryPoint Grove City.

138.    Summit is a preferred provider at StoryPoint Grove City, and Well's relationships there were developed solely through Summit.

139.    As part of her responsibilities with Summit, Well had access to and knowledge of Summit's confidential information and trade secrets.

140.    During her employment with Summit, Well received substantial compensation from it.

141.    On information and belief, Well associated with Evolution at or near the time of her separation from Summit.

### *Swearingen's Employment with Summit*

142.    Swearingen joined Summit as Chief Human Resources Officer on June 14, 2021.

143.    On June 14, 2021, as a condition of his continued employment with Summit, Swearingen executed the Agreement attached as Exhibit I.

144.    Swearingen served as Chief Human Resources Officer until his resignation from Summit on March 17, 2023.  Swearingen was aware of the agreements between Summit and the

22

Individual Defendants, including the non-interference provisions, as he or his department at Summit maintained and/or aided in the execution of them.

145.     As part of his responsibilities with Summit, Swearingen had access to and knowledge of Summit's confidential information and trade secrets.

146.     During his employment with Summit, Swearingen received substantial compensation from it.

147.     On information and belief, Swearingen associated with Evolution at or near the time of his separation from Summit.

### R. Becker's Employment with Summit

148.     R. Becker joined Summit as an RN Case Manager on November 18, 2013.

149.     R. Becker was named President of Summit in December 2019.

150.     R. Becker eventually became CEO of Summit.

151.     Upon his hiring by Summit as CEO in December 2019, as a condition of his continued employment with Summit, R. Becker executed the Agreement attached as Exhibit A.

152.     R. Becker served as CEO until his termination from Summit on March 14, 2023.

153.     As part of his responsibilities with Summit, R. Becker had access to and knowledge of Summit's confidential information and trade secrets.

154.     During his employment with Summit, R. Becker received substantial compensation from it.

155.     Upon his termination from Summit in March 2023, R. Becker began working with other current and former Summit employees to launch a home health services company to compete directly with Summit.

156.     In or around June 2023, R. Becker instructed his brother and then-current Summit employee, J. Becker, to tell other then-current Summit employees that R. Becker was starting a

23

new home health care company and that he would like those Summit employees to come work with him. J. Becker did as R. Becker instructed and subsequently had conversations, on R. Becker's behalf, to induce and encourage Summit employees to terminate their employment with Summit and join with R. Becker to launch a new competitor.

157. R. Becker worked with Sanders to form Evolution as a legal entity on October 9, 2023. R. Becker continued work with Sanders and others on behalf of Evolution after its formation for the purpose of unlawfully competing with Summit, including, upon information and belief, meeting Fairfield Home Care's owner on behalf of Evolution to negotiate Evolution's purchase of Fairfield Home Care.

158. R. Becker directed Evolution's acquisition of Fairfield Home Care so that Evolution could use Fairfield Home Care to bill for services performed by Evolution staff at senior living communities where the Individual Defendants are prohibited from servicing patients under their respective agreements with Summit.

### *Smith's Employment with Summit*

159. Smith joined Summit as a speech therapist on or around September 2017.

160. On September 22, 2017, as a condition of her continued employment with Summit, Smith executed the Agreement attached as Exhibit J.

161. Smith served as a speech therapist until her termination from Summit on December 1, 2023.

162. As part of her responsibilities with Summit, Smith had access to and knowledge of Summit's confidential information and trade secrets.

163. During her employment with Summit, Smith received substantial compensation from it.

24

164.    On information and belief, Smith associated with Evolution at or near the time of her separation from Summit.

### *Welch's Employment with Summit*

165.    Welch joined Summit as an RN Case Manager on June 21, 2023.

166.    On June 15, 2021, as a condition of her continued employment with Summit, Welch executed the Agreement attached as Exhibit K.

167.    For Summit, Welch performed services for Summit patients residing in The Kenwood senior living community in Hamilton County, specifically in The Kenwood's wellness center.

168.    On or around December 6, 2023, Summit terminated Welch's employment when it learned that Welch had been solicited to work for Evolution by Defendants Steele and Adams based on promises that she would only be able to continuing seeing Summit's patients if she joined Evolution.

169.    As part of her responsibilities with Summit, Welch had access to and knowledge of Summit's confidential information and trade secrets.

170.    During her employment with Summit, Welch received substantial compensation from it.

171.    On information and belief, Smith associated with Evolution at or near the time of her separation from Summit.

### *Steele's Employment with Summit*

172.    Steele joined Summit as RN Case Manager on May 14, 2014.

173.    On May 27, 2014, as a condition of her continued employment with Summit, Steele executed the Agreement attached as Exhibit L.

130656997v1

174.     Steele later served as Director of Quality Assurance with Summit until her termination from Summit on or around June 30, 2023.  Summit terminated Steele's employment when it learned that Steele had been contacting current Summit employees to induce and encourage those Summit employees to work for Evolution.  Steele also had shared confidential and trade secret information with a former Summit employee.

175.     As part of her responsibilities with Summit, Steele had access to and knowledge of Summit's confidential information and trade secrets.

176.     During her employment with Summit, Steele received substantial compensation from it.

177.     On information and belief, Steele associated with Evolution at or near the time of her separation from Summit.

### C. Becker's Employment with Summit

178.     C. Becker joined Summit as a sales liaison in November 2021.

179.     On December 16, 2021, as a condition of her continued employment with Summit, C. Becker executed the Agreement attached as Exhibit M.

180.     C. Becker served as a sales liaison until her termination from Summit in August 2023.

181.     As part of her responsibilities with Summit, C. Becker had access to and knowledge of Summit's confidential information and trade secrets.

182.     During her employment with Summit, C. Becker received substantial compensation from it.

183.     On information and belief, C. Becker associated with Evolution in November 2023.

### Individual Defendants' Contractual Obligations

26

130656997v1

184.     As a condition of their continued employment with Summit, the Individual Defendants executed the Agreements attached as Exhibits A through M (all agreements, collectively, the "Agreement" or the "Agreements"). The agreements contain identical confidentiality, non-solicitation, and enforcement provisions.

185.     The Individual Defendants agreed to comply with the following confidentiality protections:

> 2.  Confidentiality.  Employee recognizes and acknowledges that the relationship with, and the identity of, customers, referral sources (including, but not limited to, referring physicians), suppliers, licensees, licensors, franchisees, and business relationships of Employer, as such may exist from time to time, are valuable and unique assets.  During the course of Employee's employment, he will also learn information about the business practices of Employer, which information would be an advantage if known by the competitors of Employer.  Employee therefore agrees that he will not, during or after the conclusion of his employment, communicate or divulge to, or use for his benefit or for the benefit of any person or entity, any information concerning Employer's business practices, or any information obtained by him in the course of his employment pertaining to Employer's customers, referral sources (including, but not limited to, referring physicians), suppliers, licensees, licensors, franchisees and business relationships.  Such information is and will remain the exclusive property of Employer and shall hereinafter be referred to as Employer's proprietary information.
>
> At the conclusion of his employment with Employer, Employee will deliver intact, and not destroy, all materials, papers, books, files, documents, programs and all other information he may have concerning Employer and its proprietary information, and he will not retain any such information in any form, nor will he keep or give copies or disclose the contents of such materials to any other persons.  This delivery requirement also specifically includes all such information that is maintained through use of electronic means, computer disks, or otherwise.  Employee further specifically agrees to deliver all other materials and all other information concerning Employer, its clients, customers and accounts, which is found or recorded on or in papers, computer disks, programs, books, files, etc., owned by Employer
>
> Employee further acknowledges and agrees that all such proprietary information obtained by him during his relationship with Employer is to be treated as a trade secret as that term is defined by Ohio law.

186.     The Individual Defendants agreed to certain restrictions on soliciting, contacting, and servicing customers, referral sources, business relationships, and more:

> 3.  Non-Solicitation.  Employee agrees that during his employment, and for a period of one year after his employment concludes, he will not, in his individual capacity or as an employee, independent contractor, principal, agent, or in any other capacity, directly or indirectly contact, solicit, or service any customers, referral sources (including, but not limited to, referring physicians), suppliers, licensees, licensors, franchisees or business relationships of Employer if they were customers, referral sources (including, but not limited to, referring physicians), suppliers, licensees, licensors, franchisees or business relationships of Employer prior to the time Employee's employment concludes.

27

187.    The Individual Defendants agreed to certain restrictions on interfering, inducing, or attempting to induce any of Summit's employees to terminate their employment with Summit:

> 4. Interference with Employees. Employee, for himself or any others, directly or indirectly, shall not, for a period of one (1) year after the conclusion of his employment, induce or attempt to induce any employee, agent, or representative of Employer to terminate their employment or relationship with Employer.

188.    The restrictions in paragraphs 2, 3, and 4 of the Agreement are necessary to protect Summit's legitimate business interests.

189.    The Individual Defendants agreed that Summit is entitled to the relief it seeks in this matter, including its attorneys' fees:

> 5. Enforcement. Employee acknowledges and agrees that breach of any of ¶ 1 ("Conflict of Interest"), ¶ 2 ("Confidentiality"), ¶ 3 ("Non-Solicitation"), or ¶ 4 ("Interference with Employees") of this Agreement would cause immediate and irreparable harm and injury to Employer, and that all monetary damages could not be accurately determined and that monetary damages alone would be an inadequate remedy; therefore, upon breach of any of these provisions, Employer shall be entitled to equitable relief against such activities in any court of law possessing appropriate jurisdiction, including, but not limited to temporary restraining orders, preliminary and permanent injunctions, specific performance, and a recovery of attorneys' fees, in addition to damages and any other remedies which may be available to Employer in equity or at law or pursuant to the terms of this Agreement.
>
> The parties understand that any specific right or remedy set forth in this Agreement shall not be exclusive, but shall be cumulative upon all other remedies available to Employer, under this Agreement or by law. The failure of Employer to enforce any of the provisions of this Agreement, or any such rights with respect to any other employee, shall not constitute a waiver or limit of any of Employer's rights hereunder.
>
> The covenants contained in ¶¶ 1, 2, 3, and 4 of this Agreement shall be construed as independent of any other provisions, and independent of each other, and the existence of any claim or cause of action which Employer may have against Employee, whether based on this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of any of the covenants of these four paragraphs.

### R. Becker's Contractual Obligations

190.    As a condition of his continued employment with Summit, R. Becker executed the Agreement attached as Exhibit A. The Agreement contains confidentiality, non-solicitation, and enforcement provisions.

28

191.   R. Becker agreed to comply with the following confidentiality protections:

**9.**   **Confidential Information**.   The Executive hereby covenants, agrees and acknowledges as follows:

a.   The Executive has and will have access to and will participate in the development of or be acquainted with confidential or proprietary information and trade secrets related to the business of the Company and any present and future subsidiaries or affiliates of the Company (collectively with the Company, the "Companies"), including but not limited to (i) customer lists; the identity, lists or descriptions of any new customers, referral sources or organizations; financial statements; cost reports or other financial information; contract proposals or bidding information; business plans; training and operations methods and manuals; personnel records; software programs; email databases; reports and correspondence; and management systems policies or procedures, including related forms and manuals; (ii) information pertaining to future developments such as future marketing or acquisition plans or ideas, and potential new business and (iii) all other tangible and intangible property that are used in the business and operations of the Company. The information and trade secrets relating to the business of the Company described hereinabove in this paragraph (a) are hereinafter referred to collectively as the "Confidential Information," provided that the term Confidential Information shall not include any information (x) that is or becomes generally publicly available (other than as a result of violation of this Agreement by the Executive) or (y) that the Executive receives on a non-confidential basis from a source (other than the Company or its representatives) that is not known by him to be bound by an obligation of secrecy or confidentiality to the Company.

b.   The Executive shall not disclose, use or make known for his or another's benefit (other than the Company) any Confidential Information or use such Confidential Information in any way, except as is in the interest of the Company in the performance of the Executive's duties under this Agreement. The Executive may disclose Confidential Information when required by a third party and applicable law or judicial process, but only after providing (i) prompt notice to the Company of any third party's request for such information, which notice shall include the Executive's intent with respect to such request, and (ii) sufficient opportunity for the Company to challenge or limit the scope of the disclosure on behalf of the Company, the Executive or both (all at the Company's sole cost and expense).

c.   Upon termination of his employment with the Company for any reason, the Executive shall immediately return to the Company all Confidential Information in whatever form maintained (including, without limitation, computer discs and other electronic media).

192.   R. Becker agreed to certain restrictions on soliciting, contacting, and servicing customers, referral sources, business relationships, and more:

**8.**   **Restrictive Covenants**. The provisions of this Section 8 are in addition to, and not in lieu of, any non-competition, non-solicitation, or other similar obligations contained in any other agreements between or related to the Executive and the Company or any of its subsidiaries or Affiliates. By executing this Agreement, Employee acknowledges, reaffirms, and agrees that he is and will continue to be bound by the terms and conditions of such additional obligations.

a.   During the term of the Executive's employment with the Company and for the twelve (12) month period following the last payment by Company to Executive of any amounts due under this Agreement, Executive shall not, directly or indirectly:

(1)   Solicit, hire, retain, induce or attempt to solicit, hire, or retain or induce any employee or exclusive consultant of the Company to leave the employ of the Company or in any way interfere with the relationship between the Company and any employee or exclusive consultant thereof, except pursuant to a general solicitation which is not directed specifically to any such employee or consultant;

29

(2)    call on or contact any supplier, customer or franchisee of the Company or any agent of the Company for the purpose of soliciting, diverting or taking away or lessening any relationship with any such supplier, customer, franchisee or agent from the Company;

(3)    hire, engage, send any work to, or in any manner be associated or engaged in any activity with any supplier, contractor, franchisee, subcontractor, distributor, customer, investor or business relation of the Company if such action materially and adversely interferes with the relationship between any such person or entity with the Company;

(4)    engage or participate in any business or line of business that is engaged in the provision of (i) home health care services, as that term is defined in 42 U.S.C. § 1395x(m), (ii) hospice services, (iii) physical, occupational, and speech therapy services, including outpatient centers and contract therapy,  (the "Restricted Business"), anywhere within the State of Ohio and each of the adjacent states bordering Ohio, and any other state in which the Company conducts operations (the "Territory"); or

(5)    have an interest in, or provide advice or services to, any person or entity that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant.

193.    R. Becker agreed the restrictive covenants in Section 8 of his employment agreement are reasonable and enforceable:

c.    In connection with the foregoing provisions of this Section 8, the Executive represents that his experience, capabilities and circumstances are such that such provisions will not prevent him from earning a livelihood. The Executive further acknowledges and agrees that all such restrictive covenants set forth above are reasonably necessary to protect the legitimate business interests of the Company and are not overbroad or unreasonable.  It is acknowledged and agreed that the Company is specifically relying upon the foregoing statements in entering into this Agreement.   It is understood that the covenants made by the Executive in this Section 8 (and in Section 9 hereof) shall survive the expiration or termination of this Agreement.

194.    R. Becker agreed that Summit is entitled to the relief it seeks in this matter:

**10.    Remedies.** The Executive acknowledges that a remedy at law for any breach or threatened breach of the provisions of Sections 8 or 9 hereof would be inadequate, that the Company would be irreparably injured by such breach and that, therefore, the Company shall be entitled to injunctive relief in addition to any other available rights and remedies in case of any such breach or threatened breach.

195.    R. Becker agreed that Summit is also entitled to attorneys' fees and court costs and expenses:

**19.**   **Attorneys' Fees**.  In any action or proceeding, legal or equitable, brought under or pursuant to this Agreement, the prevailing party shall be entitled to reimbursement for all costs and expenses incurred by such party, including reasonable attorneys' fees and court costs and expenses.

### Individual Defendants' Actions

### *J. Becker, Sanders, Swearingen & R. Becker*

196.   As a condition of their continued employment with Summit, the Individual Defendants executed the Agreements attached as Exhibits A through M.

197.   Almost immediately upon his termination from Summit, Defendant R. Becker began working with Sanders to form Evolution.  R. Becker and Sanders devised a plan to solicit Summit customers, business relationships, and referral sources to join Evolution.  Because Evolution did not have any clinical or operational staff, their plan also included the solicitation of Summit employees.

198.   Defendants R. Becker and Sanders conspired with Defendants J. Becker and Swearingen for them to join Evolution, and further, either directly or indirectly though J. Becker, Sanders, Swearingen, and others, contacted Summit employees to encourage them to associate with Evolution.  Upon information and belief, Defendants J. Becker and Sanders misrepresented to current and former Summit employees that they would be unable to serve the patients they served through Summit unless they joined Evolution.

199.   Upon information and belief, Defendants J. Becker and Sanders also misrepresented to current and former Summit employees that Evolution is replacing Summit as the preferred provider in communities that Summit has preferred provider relationships.

200.   On information and belief, J. Becker, along with Defendant Adams, used Summit's confidential and trade secret information to target Summit senior living community

31

customers and referral sources, including Deerfield Springs during a sales visit to that facility on or around December 18, 2023, and attempt to switch their business from Summit to Evolution.

201.    On information and belief, Swearingen is responsible for hiring therapists and other clinicians to provide services to patients through his role as Evolution's Director of Human Resources.

202.    Swearingen is aware that various Evolution employees are former Summit employees, and is aware that these former Summit employees, including himself, are bound by their Agreements.

203.    Despite having knowledge of these Agreements, Swearingen and Evolution targeted Summit staff and encouraged them to terminate their employment with Summit and work for Evolution.

204.    J. Becker, Sanders, Swearingen, and/or R. Becker encouraged and induced other Summit employees (John Does 1-10) to violate their restrictive covenants and work for Evolution.

*Kessinger*

205.    Kessinger had a patient, customer, client, referral source, and business relationship-facing position with Summit until his termination on November 29, 2023.

206.    Kessinger and Evolution have used Summit's confidential and trade secret information on its preferred provider relationships to pursue Summit's patients within those communities.

207.    Indeed, Kessinger announced to Summit staff that he was working for Evolution (in the same role he had with Summit) before his separation from Summit.

32

130656997v1

208.    On November 30, 2023, less than 24 hours after he was terminated by phone (Kessinger did not attend a scheduled meeting with his supervisors), Kessinger displayed his Evolution business cards at the StoryPoint Grove City facility.  *See* Exhibit N.

209.    On November 30, 2023, Kessinger displayed his Evolution business cards at Traditions of Grove City, another senior living facility Summit serves.  *See* Exhibit O.

210.    Before his termination from Summit, Kessinger, had been serving between 30 and 40 residents of StoryPoint, Grove City on behalf of Summit.

211.    On December 4, 2023, StoryPoint Grove City reported to Summit that Kessinger told a patient and their power of attorney that Summit was transitioning out of StoryPoint Grove City and Evolution was now the preferred provider.  This was untrue, and Kessinger knew it.

212.    On or around December 4, 2023, Kessinger told a Summit patient that Summit did not have staff to serve her and that all of Summit's staff would be joining Evolution.  This was untrue, and Kessinger knew it.  Kessinger deceived this patient with the intent to induce this Summit patient to request to be discharged from Summit so that Kessinger and Evolution could serve her.  Kessinger knew this patient only through his employment with Summit.

213.    While employed by Summit, Kessinger also transitioned patients he served on behalf of Summit to become his personal clients, charging for his services directly and pocketing all of the fees he received.

214.    On information and belief, Kessinger has intentionally sown confusion with Summit's patients, customers, clients, referral sources, and business relationships by falsely claiming Summit does not have staff to serve them and that all of Summit's staff will be joining Evolution.

33

215. Summit, through its counsel, notified Kessinger of his obligations on December 1, 2023. Letter attached as Exhibit P.

216. Summit previously brought an action (*Affordable Home Health Care, LLC DBA Summit Orthopedic Home Care, et al. v. Joseph Kessinger, et al.*, Franklin County Court of Common Pleas, Case No. 23CV008758) against Summit for his conduct as alleged in this Complaint and a temporary restraining order was entered (attached as Exhibit Q). That matter was voluntarily dismissed and this action brought in its stead.

217. After discovering more details about Individual Defendants' and Evolution's conduct, Summit dismissed the action against Kessinger without prejudice so that it could pursue all Defendants at once.

### *Adams*

218. Adams had a customer, client, referral source, and business relationship-facing position with Summit until her termination on July 17, 2023. On information and belief, both before and since her termination, Adams misappropriated confidential information and trade secrets of Summit.

219. Examples of Adams' and Evolution's misappropriation of Summit's confidential information and trade secrets include, but are not limited to, using Summit's confidential business intelligence to target the senior living communities and hospital referral sources she worked with on behalf of Summit.

220. Indeed, upon information and belief, Adams announced to Summit patients that she/Evolution were offering wound care services and encouraged patients with open wounds to request a discharge from Summit and re-admission with Evolution.

130656997v1

221.    Adams is prohibited from soliciting or contacting the referral sources that work with Summit.  Yet she has been targeting those relationships.

222.    On multiple occasions in November and December 2023, Adams displayed Evolution business cards at a number of referring offices where Summit had developed relationships to serve patients, including Bethesda North hospital, Mercy Fairfield hospital, Mercy Anderson hospital, and Mercy Jewish hospital.

223.    In early December 2023, Summit received reports that Adams visited The Kenwood (an assisted living facility in Cincinnati), entered patient rooms and told patients that if they wanted to keep their regular care, they needed to be discharged from Summit and request to be served by Evolution.  Adams only knew these patients through her employment with Summit.

224.    On or around December 6, 2023, Adams informed a Summit patient that if he wanted to keep receiving his regular care, he must be discharged from Summit and request to be served by Evolution.

225.    On or around December 7, 2023, a Summit patient misled by Adams advised Summit that she wanted to be discharged from Summit so that Adams and Evolution could serve her.

226.    On or around December 8, 2023, a Summit patient misled by Adams advised Summit that he wanted to be discharged from Summit so that Adams and Evolution could serve him.

227.    On information and belief, Adams, along with Defendant J. Becker, specifically targeted current Summit senior living community customers and referral sources, including Deerfield Springs during a sales visit to that facility on or around December 18, 2023, to switch their business from Summit to Evolution.

228. On information and belief, Adams has intentionally sown confusion with Summit's customers, clients, referral sources, and business relationships by falsely claiming Summit does not have staff to serve them and that all of Summit's staff will be joining Evolution.

229. Adams has also induced or attempted to induce Summit's employees, including Defendant Welch, to join Evolution.

230. As part of the inducement, Adams and Evolution told current and former Summit employees that they will only be able to serve the locations they serve now with Summit if they go to work for Evolution.

231. Adams knows that the Summit employees are under the same or similar restrictions that she has with Summit, and yet she lies to them.

232. Summit, through its counsel, notified Adams of her obligations on December 14, 2023. Letter attached as Exhibit R.

233. Adams has refused to comply with the Agreement.

### *Stratton*

234. Stratton had a customer, client, referral source, and business relationship-facing position with Summit until her separation on December 5, 2023. On information and belief, both before and since her termination, Stratton misappropriated confidential information and trade secrets of Summit.

235. Indeed, Stratton announced to Summit staff that she was going to work for Evolution (in the same role she had with Summit) before her separation from Summit.

36

236.    Stratton explained to Summit staff that the only way she can continue to serve the patients at StoryPoint Grove City would be to become employed by Evolution. She reiterated Evolution's claim that it was replacing Summit as the preferred provider at that location.

237.    Summit, through its counsel, notified Stratton of her obligations on December 12, 2023. Letter attached as Exhibit S.

238.    Stratton has refused to comply with the Agreement.

239.    On December 21, 2023, Stratton was on site at StoryPoint Grove City, soliciting patients and staff. She has attempted to introduce other former Summit employees to StoryPoint Grove City.

*Dean*

240.    Dean had a customer, client, referral source, and business relationship-facing position with Summit until his resignation on November 27, 2023. On information and belief, both before and since his termination, Dean misappropriated confidential information and trade secrets of Summit.

241.    Dean serviced Union, Franklin, and Delaware, Ohio counties as a physical therapist for Summit. He serviced patients in both home and assisted and independent living facilities, including StoryPoint Grove City, StoryPoint Spring Leaf, and StoryPoint Walnut Crossing.

242.    Dean told Summit staff that the only way he can continue to serve the patients at StoryPoint Grove City, Spring Leaf, and Walnut Crossing that he served through Summit would be to become employed by Evolution. Dean reiterated Evolution's claim that it was replacing Summit as the preferred provider at those locations.

243.    Summit, through its counsel, notified Dean of his obligations on December 22, 2023. Letter attached as Exhibit T.

37

244.    Dean has refused to comply with the Agreement.

### Well

245.    Well had a customer, client, referral source, and business relationship-facing position with Summit until her resignation on October 27, 2023. On information and belief, both before and since her termination, Well misappropriated confidential information and trade secrets of Summit.

246.    Well serviced Franklin and surrounding counties in Ohio as an RN for Summit.

247.    Well serviced both in home and assisted and independent living facilities, including StoryPoint Grove City, for Summit.

248.    Almost immediately after Well's resignation from Summit on November 9, 2023, she attempted to begin seeing the same patients she had served for Summit in her new role with Evolution.

249.    Summit, through its counsel, notified Well of her obligations on December 22, 2023. Letter attached as Exhibit U.

250.    Well has refused to comply with the Agreement.

### Smith

251.    Smith had a customer, client, referral source, and business relationship-facing position with Summit until her resignation. On information and belief, both before and since her termination, Smith misappropriated confidential information and trade secrets of Summit.

252.    Smith serviced Summit as a speech therapist.

253.    On January 9, 2024, Smith was on site with Kessinger at StoryPoint Grove City, soliciting patients and staff on behalf of Evolution.

254.    Smith has refused to comply with the Agreement.

38

*Welch*

255.    Welch had a customer, client, referral source, and business relationship-facing position with Summit until her termination on December 6, 2023.

256.    On behalf of Summit, Welch served patients who resided in The Kenwood. Welch was solicited to work for Evolution by Defendants Steele and Adams.

257.    On information and belief, both before and since her termination, Welch misappropriated confidential information and trade secrets of Summit.

258.    Welch serviced Summit as an RN Case Manager.

259.    Welch has refused to comply with the Agreement.

*Steele*

260.    Steele had an administrative position with Summit until her separation on June 30, 2023. On information and belief, both before and since her termination, Steele misappropriated confidential information and trade secrets of Summit.

261.    Initially hired by Summit as an RN Case Manager, Steele later served Summit as Director of Quality Assurance. On information and belief, in her employment with Evolution, Steele has been involved in identifying, targeting and soliciting Summit clinical staff to leave their employment with Summit and work for Evolution.

262.    Steele has refused to comply with the Agreement.

*C. Becker*

263.    C. Becker had a customer, client, referral source, and business relationship-facing position with Summit until her separation on August 14, 2023.  On information and belief, both before and since her termination, C. Becker misappropriated confidential information and trade secrets of Summit.

264.    C. Becker served Summit as a sales liaison.

39

265.    On January 12, 2024, C. Becker and Kessinger arranged for Smith and Stratton to perform speech and physical therapy evaluations for a Summit patient solicited from Summit.

266.    C. Becker has refused to comply with the Agreement.

### *Individual Defendants*

267.    Individual Defendants' actions in misleading staff at multiple senior living communities by claiming that Summit has exited or will exit from certain locations, that it is going bankrupt, and that Evolution is taking away all Summit staff has created confusion and harm.

268.    If the Individual Defendants are not temporarily restrained and preliminarily and permanently enjoined from soliciting Summit's customers, referral sources, and business relationships and retaining and using the information misappropriated by them, Summit will sustain injuries for which it will never be fully compensated by an award of money damages. The full amount of losses Summit will suffer because of Defendants' actions can never be fully calculated.  Furthermore, the injury from disclosing confidential information and misappropriating  trade secrets and customer and other goodwill is irreparable.  Summit has no adequate remedy at law.

### Actions of Fairfield Home Care and Ninas' Health Care

269.    On information and belief, Defendants Fairfield Home Care and Ninas' Health Care have coordinated with Evolution to harm Summit by interfering with Summit's business relationships.

270.    On information and belief, Evolution and Fairfield Home Care entered into a transaction in or around November 2023 pursuant to which Evolution purchased Fairfield Home Care.  On information and belief, this transaction was directed, negotiated, and finalized on

40

Evolution's behalf by Defendants R. Becker and Sanders, and the initial purchase price for the transaction was paid by Defendant Finney.

271.    On information and belief, Defendant R. Becker directed the consummation of the acquisition of Fairfield Home Care so that patient care services performed by Evolution staff could be billed for reimbursement through Medicare, Medicaid, and/or other third-party payer agreements held by Fairfield Home Care.

272.    On information and belief, Evolution also entered into an arrangement with Defendant Ninas' Health Care whereby Ninas' Health Care bills Medicare, Medicaid, and/or other third-party payer contracts for services performed by Evolution staff.

273.    Upon information and belief, neither Fairfield Home Care nor Ninas' Health Care employ the Individual Defendants (or any Evolution employees) who have provided services for which Fairfield Home Care and Ninas' Heath Care have billed.

274.    Staff performing services for which claims for reimbursement are submitted are generally employed by the party who submits the claims, unless the treating providers have entered into a third-party billing agreement under which the services are billed appropriately.

275.    On information and belief, Fairfield Home Care and Ninas' Health Care have billed and continue to bill for services performed by Evolution staff at senior living communities where the Individual Defendants are prohibited from servicing patients under their Agreements with Summit.

276.    On information and belief, Fairfield Home Care and Ninas' Health Care are both billing for services performed by Evolution staff and funneling all or a portion of the reimbursements they receive under this arrangement to Evolution, even though Evolution is not authorized to receive such reimbursements.

277.     On information and belief, Fairfield Home Care and Ninas' Health Care channels all or a portion of the reimbursements it receives under this arrangement to Evolution.

278.     On information and belief, Ninas' Health Care is aware of Evolution's and Fairfield Home Care's unlawful intent behind Evolution's purchase of Fairfield Home Care to compete unfairly with Summit.

### Evolution's Actions

279.     Evolution, through R. Becker, J. Becker, Sanders, and Swearingen, and others, induced the other Individual Defendants to breach their agreements with Summit.

280.     Alternatively, Evolution was complicit in J. Becker's pursuit and hiring of Sanders, as well as in J. Becker's, Sanders', and Swearingen's, and others', subsequent inducement of the other Individual Defendants to breach their agreements with Summit.

281.     With full knowledge of the Individual Defendants' Agreements with Summit, Evolution used confidential and proprietary information offered by R. Becker, J. Becker, Sanders, and Swearingen, and others, to solicit Summit employees.

282.     Evolution hired and has retained Kessinger since at least November 30, 2023 in the same capacity Kessinger served Summit and while knowing of his obligations under the Agreement.

283.     Evolution, on information and belief, has directed or endorsed Kessinger's pursuit of Summit's patients, customers, referral sources, and other business relationships.

284.     Evolution hired and has retained Adams in the same capacity Adams served Summit and while knowing of her obligations under the Agreement.

285.     Evolution, on information and belief, has directed or endorsed Adams' pursuit of Summit's patients, customers, referral sources, and other business relationships.

286.   Evolution hired and has retained Stratton in the same capacity Stratton served Summit and while knowing of her obligations under the Agreement.

287.   Evolution, on information and belief, has directed or endorsed Stratton's pursuit of Summit's patients, customers, referral sources, and other business relationships.

288.   Evolution hired and has retained Dean since at least on or around December 18, 2023 in the same capacity Dean served Summit while knowing of his obligations under the Agreement.

289.   Evolution, on information and belief, has directed or endorsed Dean's pursuit of Summit's patients, customers, referral sources, and other business relationships.

290.   Evolution hired and has retained Well since at least on or around November 2023 in the same capacity Well served Summit and while knowing of her obligations under the Agreement.

291.   Evolution, on information and belief, has directed or endorsed Well's pursuit of Summit's patients, customers, referral sources, and other business relationships.

292.   Evolution, on information and belief, hired and has retained Smith in the same capacity Smith served Summit and while knowing of her obligations under the Agreement.

293.   Evolution, on information and belief, has directed or endorsed Smith's pursuit of Summit's patients, customers, referral sources, and other business relationships.

294.   Evolution, on information and belief, hired and has retained Steele in the same capacity Steele served Summit and while knowing of her obligations under the Agreement.

295.   Evolution, on information and belief, has directed or endorsed Steele's pursuit of Summit's employees.

296.    Evolution, on information and belief, hired and has retained Welch in the same capacity Welch served Summit and while knowing of her obligations under the Agreement.

297.    Evolution, on information and belief, has directed or endorsed Welch's pursuit of Summit's customers, referral sources, and other business relationships.

298.    Evolution, on information and belief, and with the assistance of R. Becker, J. Becker, and Sanders, purchased Fairfield Home Care in furtherance of its plan to compete unfairly and unlawfully with Summit.

299.    Defendant Finney, upon information and belief, was aware of Evolution's, R. Becker's, J Becker's, and Sanders' unlawful intent behind the purchase of Fairfield Home Care and supplied to Evolution the funds constituting the initial purchase price to complete the acquisition transaction.

300.    Evolution hired and has retained C. Becker in the same capacity C. Becker served Summit and while knowing of her obligations under the Agreement.

301.    Evolution, on information and belief, has directed or endorsed C. Becker's pursuit of Summit's patients, customers, referral sources, and other business relationships.

302.    Evolution's conduct has been premeditated and calculated to cause harm to Summit.

303.    If Evolution is not temporarily restrained and preliminarily and permanently enjoined from interfering with Summit's contracts, business expectancies, and from misappropriating, retaining, and using the information Summit's confidential information and trade secrets, Summit will sustain injuries for which it will never be fully compensated by an award of money damages.  The full amount of losses Summit will suffer because of Evolution's actions can never be fully calculated.  Furthermore, the injury from disclosing confidential

44

information and misappropriating trade secrets and customer and other goodwill is irreparable. Summit has no adequate remedy at law.

## COUNT I
## ALL DEFENDANTS: VIOLATION OF THE DEFEND TRADE SECRETS ACT
### (18 U.S.C. § 1836, *et seq.*)

304.    Summit repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

305.    As described above, Summit has developed and maintained significant non-public, confidential, and proprietary information and trade secrets relating to providing specialty health care services such as home health, orthopedics, neurology, infusion care, and hospice care in Ohio and Indiana for patients and providers located in Ohio and Indiana.

306.    To provide such specialty health care services, Summit relies on its private and confidential financial, business, scientific, technical, and economic information including: past practices and patterns of providers and patients within the industry; formulas related to billing practices, healthcare costs, customer acquisition, and customer development; and methods, techniques, processes, procedures, and programs utilized within the senior living communities it services and those it intends to service.

307.    Over many years, Summit created and developed this private and confidential financial, business, scientific, technical, and economic information.

308.    Evolution obtained and continues to attempt to obtain Summit's business by using, touting, and sharing with patients, referral sources, and business relationships Summit's years of knowledge of strategies and tactics for Summit's home health care franchise—specialized knowledge that is proprietary to Summit and that developed at Summit's expense over the course of many years.

309. Evolution and its members were aware, before and at the time of its formation, that Summit's trade secrets were not to be used or disclosed to others.

310. Evolution did not obtain Summit's consent to use its trade secrets. Nevertheless, it misappropriated, if not stole, Summit's trade secrets to compete with Summit.

311. Summit derives a competitive advantage and independent economic value from these trade secrets because they are not generally known to the public or to others who can obtain economic value from their disclosure or use.

312. Evolution staffed itself with senior administrative employees and experienced clinical staff of Summit. Evolution refuses to ensure it will protect Summit's trade secrets it learns from these employees, and has indeed used information it learned from Summit's former employees in its business.

313. Individual Defendants' work for Evolution substantially overlaps with the work they did for Summit—they maintain the same or substantially similar roles, participate in the same industry and geographic region, and use Summit's confidential information and trade secrets to Summit's detriment by targeting the very same facilities and patients that they previously came to know only through their employment with Summit.

314. Defendants have improperly used Summit's trade secret information, such as general business intelligence, agency census data, patient admissions data, and location specific volume and discipline information associated with Summit's clients, patients, referral sources, and business partners.

315. Summit's trade secrets, as described herein, are related to services it provides in interstate commerce, including across Ohio and Indiana.

316. Summit's trade secrets, as described herein, are related to business relationships that exist or that it intends to develop in Ohio and Indiana.

317. Summit's trade secrets, as described herein, are related to the existing and prospective healthcare services it provides to clients, customers, and patients who live in Ohio, Indiana, and who may permanently reside outside Ohio or Indiana.

318. Summit's trade secrets are confidential and proprietary, and Summit protects such by, among others, entering agreements with confidentiality, non-solicit, non-compete, and non-disclosure provisions. These measures are taken by Summit to keep its confidential and proprietary information secret during and after an employee's association with Summit.

319. Evolution knew the information it received from the Individual Defendants, including general business intelligence, agency census data, patient admissions data, and location specific volume and discipline information associated with Summit's clients, patients, referral sources, and business partners, were Summit's trade secrets.

320. Defendants improperly used Summit's trade secrets to identify and solicit existing customers, clients, patients, referral sources, and business relationships.

321. The Individual Defendants and Evolution were warned of the consequences of violating their Agreements with Summit yet they continue to violate their Agreements with Summit through their employment with Evolution.

322. Defendants willfully and maliciously misappropriated Summit's confidential business information and trade secrets in order to gain economic value from them.

323. As a direct and proximate result of Defendants' current and continued misappropriation of Summit's confidential business information and trade secrets, Summit has suffered and continues to suffer imminent and irreparable harm.

47

324.     Summit is entitled to injunctive relief in its favor as set forth by 18 U.S.C. § 1836(b)(3), *et seq*., and an award of damages for actual loss caused by Defendants' misappropriation of its trade secrets.

## COUNT II
## INDIVIDUAL DEFENDANTS: BREACH OF CONTRACT

325.     Summit repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

326.     The non-solicitation and confidentiality provisions in the Agreements are valid, enforceable obligations necessary to protect Summit's legitimate business interests and prevent unfair competition by its former employees.

327.     Summit has complied with its obligations under the Agreement.

328.     The Individual Defendants have breached their Agreements.

329.     Summit is entitled to preliminary and permanent injunctions against further breaches by the Individual Defendants.

330.     As a direct and proximate result of the Individual Defendants' breaches of contract, Summit has suffered substantial monetary damages in excess of the jurisdictional minimum of this Court, and not less than $25,000, which will be established at trial.

331.     Under the Agreement, and as a direct and proximate result of the Individual Defendants' breaches of contract, Summit is entitled to recovery of its attorneys' fees.

## COUNT III
## ALL DEFENDANTS: MISAPPROPRIATION OF TRADE SECRETS
## (ORC § 1333.61, *ET SEQ.*)

332.     Summit repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

333.    As described above, Summit has developed and maintained significant non-public, confidential, and proprietary information and trade secrets relating to providing specialty health care services such as home health, orthopedics, neurology, infusion care, and hospice care in Ohio.

334.    As part of the development of its business, Summit has expended substantial time, labor, and money to research proprietary business methods, strategies, technologies, processes, products, intellectual property, marketing plans and procedures, and other proprietary information on its customer and client preferences, contact information, sales and marketing strategies, customer development strategies and methods, patient referral trends and histories, development of employees, referral sources, and customers, and other confidential and proprietary information.

335.    To provide such specialty health care services, Summit relies on its private and confidential financial, business, scientific, technical, and economic information including: past practices and patterns of providers and patients within the industry; customer acquisition, and customer development; and methods, techniques, processes, procedures, and programs utilized within the senior living communities it services and those it intends to service.

336.    Over many years, Summit created and developed this private and confidential financial, business, scientific, marketing, technical, and economic information.

337.    Evolution obtained and continues to attempt to obtain Summit's business by using, touting, and sharing with patients, referral sources, and business relationships Summit's years of knowledge of strategies and tactics for Summit's home health care franchise—specialized knowledge that is proprietary to Summit and that developed at Summit's expense over the course of many years.

49

338.    Evolution was aware, before and at the time of its formation, that Summit's trade secrets were not to be used or disclosed to others.

339.    Evolution did not obtain Summit's consent to use its trade secrets. Nevertheless, it used Summit's trade secrets to compete with Summit.

340.    Summit derives a competitive advantage and independent economic value from these trade secrets because they are not generally known to the public or to others who can obtain economic value from their disclosure or use.

341.    Evolution staffed itself with senior administrative employees and experienced clinical staff of Summit. Evolution refuses to ensure it will protect Summit's trade secrets it learns from these employees, and has indeed used information it learned from Summit's former employees in its business.

342.    Individual Defendants' work for Evolution substantially overlaps with the work they did for Summit—they maintain the same or substantially similar roles, participate in the same industry and geographic region, and use Summit's confidential information and trade secrets to Summit's detriment by targeting the very same facilities and patients that they previously came to know only through their employment with Summit.

343.    Defendants have improperly used Summit's trade secret information, such as general business intelligence, agency census data, patient admissions data, and location specific volume and discipline information associated with Summit's clients, patients, referral sources, and business partners.

344.    Summit has taken substantial measures and exercised due diligence to prevent its business-related documents and information from becoming available to persons other than those selected by it to have access to them.

345.     The Individual Defendants were provided access to confidential and trade secret information during their employment with Summit to permit them to perform their job duties.

346.     The Individual Defendants have improperly retained and/or used certain of Summit's confidential and trade secret information following their separation from Summit in efforts to target Summit's preferred provider communities.

347.     The Individual Defendants have used, or inevitably will use, this confidential and trade secret information in performing their duties for themselves and Evolution.

348.     Upon information and belief, Evolution has used, or inevitably will use, this trade secret information in performing its duties as a home health agency.

349.     Defendants' unauthorized disclosure and/or use of Summit's trade secrets constitute misappropriation of trade secrets under common law and under Ohio's Trade Secrets Act, R.C. §1333.61, *et seq.*

350.     Summit has at all times had a protectable business interest in these documents and information, and has taken reasonable steps to protect the secrecy of this information.

351.     Defendants have misappropriated Summit's trade secrets knowingly, willfully, maliciously, intentionally, and in bad faith.

352.     The misappropriation of trade secrets has proximately caused substantial damage to Summit including, but not limited to, lost profits and loss of goodwill, unjust enrichment, or a reasonable royalty, in an amount not less than $25,000, to be established at trial.

353.     Unless Defendants are preliminarily and permanently enjoined from misusing, converting, disclosing, and misappropriating Summit's proprietary and trade secret information, Summit will suffer immediate and irreparable injury, loss, or damage for which there is no adequate remedy at law.

354.     Summit is entitled to a preliminary and permanent injunction against further use, possession, and disclosure by Defendants of such proprietary and trade secret information, and against any future development or activities that would or could make use of such proprietary and trade secret information.

355.     Summit is entitled to punitive damages and attorney's fees for Defendants' willful and malicious misappropriation of Summit's trade secrets.  R.C. §§1333.63(B) and 1333.64.

### COUNT IV
### ALL DEFENDANTS: UNFAIR COMPETITION

356.     Summit repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

357.     Defendants are unfairly competing with Summit.

358.     Defendants have made a strategic decision to try to maliciously target and take away Summit's patients, customers, and clients to gain an unfair advantage.

359.     Evolution has made a strategic decision to try to maliciously target and hire away Summit employees to gain an unfair advantage.

360.     Evolution has made a strategic decision to try to maliciously target Summit's preferred provider relationships and referral sources to gain an unfair advantage.

361.     On information and belief, Defendants are using Summit's confidential information and/or trade secrets to compete with Summit.

362.     Defendants' conduct constitutes unfair competition.

363.     This unfair competition has been willful, deliberate, and malicious.

364.     Defendants have benefitted from their acts of unfair competition.

365.     As a direct and proximate result of Defendants' acts of unfair competition, Summit has suffered and continues to suffer damages in an amount that is not now ascertainable

52

in excess of the jurisdictional minimum of this Court, and not less than $25,000, which will be established at trial.

366.    Summit will further be irreparably harmed unless this Court enjoins the activities of Defendants.

### COUNT V
### ALL DEFENDANTS: TORTIOUS INTERFERENCE
### WITH PROSPECTIVE BUSINESS EXPECTANCIES

367.    Summit repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

368.    Summit has a valid business expectancy that it will continue to reap the benefits of its preferred provider relationships, as well as its confidential and proprietary information, by continuing to provide service to its patients, customers, and clients.

369.    With knowledge of Summit's valid business expectancies, Defendants have intentionally and maliciously interfered with these expectancies as they relate to certain preferred provider relationships, including referral sources.

370.    Defendants have no privilege or justification to interfere with Summit's valid business expectancies.

371.    Defendants have engaged in the conduct complained of in a willful and malicious manner, with an improper motive and through improper means, entitling Summit to an award of punitive damages.

372.    Defendants are aware of Summit's business relationships with various customers, employees, providers, and senior living communities and the staff at those communities, and purposefully interfered with those relationships by hindering and/or preventing Summit from doing business with these relations.

130656997v1

373.     Defendants are aware of Summit's contractual relationships with customers, employees, providers, and senior living communities and the staff at those communities, and purposefully interfered with those contracts by inducing and/or encouraging breaches of the same.

374.     As a direct and proximate result of Defendants' acts of tortious interference with Summit's business expectancies, Summit has suffered and continues to suffer damages in an amount that is not now ascertainable, but exceeds the jurisdictional minimum of this Court, and not less than $25,000, which will be established at trial.

375.     Defendants will continue their acts of tortious interference with Summit's business expectancies, and Summit will be irreparably harmed thereby unless the Court enjoins such activities.

## COUNT VI
## ALL DEFENDANTS: CIVIL CONSPIRACY

376.     Summit repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

377.     Defendants, as described above, maliciously conspired and acted with intent of depriving Summit of its property, confidential information, and trade secrets, intending to damage Summit's business.

378.     Defendants have conspired together to target and hire away Summit employees based on false information and misrepresentations.

379.     Defendants have conspired together to target and interfere with Summit's preferred provider relationships, patients, clients, customers, and referral sources.

380.     Defendants' conspiratorial conduct also includes the creation of questionable, and likely impermissible, billing and reimbursement arrangements designed to mislead Medicare,

54

Medicaid and/or commercial third-party payers. Because Evolution is not yet a party to any reimbursement agreements with government and commercial payers, it schemed with Fairfield Home Care and Ninas' Health Care to arrange for those entities to prepare and submit claims for reimbursement for services provided by Summit's former employees.

381. On information and belief, through their arrangement with Evolution, Fairfield Home Care and Ninas' Health Care are and have been submitting false and fraudulent claims for government and commercial payer reimbursements and receiving reimbursements to which they are not entitled.

382. The collective actions of Evolution, Fairfield Home Care and Ninas' Health Care were specifically designed to mislead not only senior living communities into believing that Evolution and its staff are able to perform and bill for services in a legally compliant manner, but also to deceive healthcare reimbursement sources such as Medicare, Medicaid, and commercial payers into paying reimbursements that ultimately were channeled to Evolution, which was not legally authorized to receive them.

383. As a direct and proximate result of the wrongful conduct of Defendants, Summit has suffered and continues to suffer damages in an amount that is not now ascertainable, but exceeds the jurisdictional minimum of this Court, and not less than $25,000, which will be established at trial.

384. Upon information and belief, Defendants will continue to conspire to harm Summit, such that it will be irreparably harmed unless such activities are enjoined by this Court.

**COUNT VII**
**INDIVIDUAL DEFENDANTS: BREACH OF DUTY OF LOYALTY**

385. Summit repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

130656997v1

386.     The Individual Defendants, as employees of Summit, owed an undivided duty of loyalty to Summit not to use their position at Summit for their own personal benefit or the benefit of another, or to hinder Summit's ability to succeed in its business operations.

387.     As described above, during their employment with Summit and without its knowledge, the Individual Defendants breached their duty of loyalty by, among other things, siphoning or attempting to siphon patients, relationships, referral sources, and employees from Summit and by taking actions in favor of Evolution.

388.     Individual Defendants' breach of their duty of loyalty to Summit, to the extent that the breach is premised on their own personal benefit or the benefit of another, is premised on facts distinct from those supporting their violations of ORC § 1333.61, *et seq.*, as alleged above.

389.     As a direct and proximate result of the wrongful conduct of the Individual Defendants, Summit has suffered and continues to suffer damages in an amount that is not now ascertainable, but exceeds the jurisdictional minimum of this Court, and not less than $25,000, which will be established at trial.

390.     By breaching their duty of loyalty to Summit, the Individual Defendants acted with malice, wantonness, bad faith, and with the specific intent to cause harm to Summit, which conduct entitles Summit to punitive damages in an amount to be determined at trial.

**COUNT VIII**
**EVOLUTION, J. BECKER, R. BECKER, SANDERS & SWEARINGEN:**
**TORTIOUS INTERFERENCE WITH CONTRACT**

391.     Summit repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

392.     The Agreements are valid, binding, and enforceable contracts between Summit and the Individual Defendants.

393.     As described above, Evolution was aware of the Individual Defendants' obligations under the Agreements.

394.     J. Becker, R. Becker, Sanders, and Swearingen were aware of the Individual Defendants' obligations under the Agreements.

395.     J. Becker, R. Becker, Sanders, and Swearingen solicited Summit's employees before and after the formation of Evolution to join Evolution.

396.     Evolution solicited Summit's employees after its formation.

397.     Defendants are aware of Summit's relationships with customers, employees, providers, and senior living communities and the staff at those communities, and purposefully interfered with those contracts by inducing and/or encouraging breaches of the same.

398.     Evolution, J. Becker, R. Becker, Sanders, and Swearingen have interfered with the Individual Defendants' obligations under their Agreements by inducing and encouraging them to pursue Summit's customers, referral sources, and business relationships, and, upon information and belief, more.

399.     Evolution's, J. Becker's, R. Becker's, Sanders', and Swearingen's conduct was and is intentional and malicious.

400.     As a direct and proximate result of the wrongful conduct of Evolution, Becker, R. Becker, Sanders, and Swearingen, Summit has suffered and continues to suffer damages in an amount that is not now ascertainable, but exceeds the jurisdictional minimum of this Court, and not less than $25,000, which will be established at trial.

57

WHEREFORE, Summit requests that this Court issue temporary, preliminary, and permanent injunctions:

1)     enjoining the Individual Defendants for one year from the Court's entry from engaging in any act in violation of the Non-Solicitation obligations of the Agreement, including, but not limited to, directly or indirectly, contacting, soliciting, or servicing any customers, referral sources, and more, as defined by the Agreement;

2)     enjoining the Individual Defendants for one year from the Court's entry from engaging in any act in violation of the non-interference obligations of the Agreement, including, inducing or attempting to induce any employee, agent, or representative of Summit to terminate their employment or relationship with Summit;

3)     enjoining Defendants from directly or indirectly disclosing or otherwise using Summit's confidential, proprietary, or trade secret information for the benefit of themselves or any third party;

4)     directing the Individual Defendants and Evolution, as applicable, to return to Summit all documents (both electronic and tangible, including all copies), information, and property belonging to Summit, including all confidential, proprietary or trade secret information, in electronic, documentary, or other tangible or intangible form, that they possess, individually and/or together, including the documents and records the Individual Defendants have misappropriated;

130656997v1

5)     directing Defendants to have no contact, directly or indirectly, with business contacts identified in the misappropriated documents;

6)     ordering an accounting of all revenue, profits, or any other financial gain attributable to Defendants' unlawful acts as alleged herein; and,

7)     granting any other relief that the Court finds appropriate.

WHEREFORE, Summit further requests that this Court enter judgment against Defendants as follows:

1)     in the amount of all actual damages that Summit has been determined at the trial of this action to have sustained;

2)     for all available statutory damages;

3)     for available exemplary, punitive, and treble damages;

4)     for all allowable costs and Summit's attorneys' fees and other litigation costs and expenses to the extent recoverable under applicable law;

5)     for payment to Summit of all revenue, profits, or any other financial gain attributable to Defendants' unlawful acts as alleged herein;

6)     prejudgment and post-judgment interest; and,

7)     granting any other necessary injunctive relief and any other relief that may be just and proper.

## **JURY DEMAND**

Summit demands a trial by jury on all triable issues.

Respectfully submitted,


*/s/ Brian G. Dershaw*
Brian G. Dershaw (0072589)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
(513) 381-2838
(513) 381-0205 (fax)
bdershaw@taftlaw.com

Marc Kessler (0059236)
Amy Vogel (0075169)
TAFT STETTINIUS & HOLLISTER LLP
41 S. High Street, Suite 1800
Columbus, Ohio 43215
(614) 334-6131
(614) 221-2007 (fax)
avogel@taftlaw.com

*Trial Attorneys for Plaintiffs*

60

130656997v1

## **PRAECIPE FOR SERVICE**

To the Clerk:


Please serve the Summons and copy of this Complaint, on Defendants at the addresses shown in the caption by certified mail, return receipt requested.




*/s/ Brian G. Dershaw* _____

130656997v1